## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES

v.

JESUS COLON

No. 3:97-cr-48 (SRU)

## <u>ORDER</u>

On April 30, 1998, following a multi-week trial, a jury found Colon guilty of the

following crimes:

- <u>Count One</u>:  Racketeering, in violation of 18 U.S.C. § 1962(c);

- <u>Count Two</u>:  Conspiracy to racketeer, in violation of 18 U.S.C. § 1962(d);

- <u>Count Four</u>:  Conspiracy to murder Betsy Rodriguez in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5);

- <u>Count Five</u>:  Attempt to murder Betsy Rodriguez in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) and 2;

- <u>Count Seven</u>:  Murder of Ronald Foreman in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1);

- <u>Count Fourteen</u>:  Conspiracy to possess with intent to distribute and to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and

- <u>Count Twenty-Three</u>:  Engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848.

*See* Verdict Form, Doc. No. 940; Second Superseding Indictment, Doc. No. 661.  On October

27, 1998, District Judge Alan H. Nevas held a sentencing hearing and sentenced Colon to five

concurrent life sentences on Counts One, Two, Seven, Fourteen and Twenty-Three and to 120

months' imprisonment (to run concurrently) on Counts Four and Five.  *See* Min. Entry, Doc. No.

1096; Judgment, Doc. No. 1098.  Colon, who is now 44 years old and has spent about 22 years in prison, is currently serving his life sentences.

On July 22, 2020, Colon (through counsel) filed a motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended in 2018 by the First Step Act.  *See* Mot. for Release, Doc. No. 1805; Sealed Mot. for Release, Doc. No. 1807.  Colon contends that "extraordinary and compelling reasons" warrant his release.  Mot. for Release, Doc. No. 1805, at 1.  More specifically, Colon seeks release based on (1) his obesity and (2) the circumstances at the prison facility where he is currently housed.  *Id.* at 2–3.  (In an abundance of caution, and to protect Colon's safety, the parties have concealed from public view—by filing redacted briefs— the identity of that prison facility and the coronavirus statistics associated with it.)  On August 19, the government filed an opposition.  *See* Gov't Opp'n, Doc. No. 1817; Sealed Gov't Opp'n, Doc. No. 1816.  The government argues that I "need not reach Colon's arguments concerning his medical conditions or review the medical records" because "[b]ased solely on a consideration of the sentencing factors under 18 U.S.C. § 3553(a)," I should deny Colon's motion.  Gov't Opp'n, Doc. No. 1817, at 7.  On September 17, Colon filed a reply brief.  *See* Colon's Reply, Doc. No. 1819; Sealed Colon's Reply, Doc. No. 1821.  For the following reasons, I **deny** Colon's motion for release.[1]

### I.      Standard of Review

The First Step Act of 2018 (the "FSA") amended the language of section 3582(c)(1)(A). Before the FSA, only the Director of the Bureau of Prisons (the "BOP") could make a motion for the court to reduce a defendant's sentence based on extraordinary and compelling reasons.  It is

---

[1]  Colon seeks a "prompt telephonic or videographic hearing to address this motion."  *See* Colon's Reply, Doc. No. 1819, at 8.  But I conclude that such a hearing is unnecessary.  I note that numerous other courts have ruled on motions for compassionate release without hearings.  *See, e.g.*, *United States v. Morales*, 2020 WL 4931395, at *6 n.3 (D. Conn. Aug. 20, 2020); *United States v. Edington*, 2020 WL 2744140, at *2 n.3 (D. Colo. May 27, 2020).

widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few inmates were granted compassionate release. *See, e.g.*, U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* i (April 2013), https://oig.justice.gov/reports/2013/e1306.pdf ("[W]e found that the existing BOP compassionate release program has been poorly managed and implemented inconsistently, likely resulting in eligible inmates not being considered for release and in terminally ill inmates dying before their requests were decided."); Shon Hopwood, *Second Looks & Second Chances*, 41 CARDOZO L. REV. 83, 105–06 (2019); William W. Berry III, *Extraordinary and Compelling: A Re-Examination of the Justifications for Compassionate Release*, 68 MD. L. REV. 850, 868 (2009) (noting that, in the 1990s, 0.01 percent of inmates annually were granted compassionate release).

Congress passed the FSA against that backdrop.  The FSA altered section 3582(c)(1)(A), in part, to increase the use of compassionate release.  *See* 164 Cong. Rec. H10358 (daily ed. Dec. 20, 2018) (titling changes to section 3582(c)(1)(A) as "Increasing the Use and Transparency of Compassionate Release").  In particular, the FSA amended section 3582(c)(1)(A) to allow a defendant him- or herself to bring a motion for compassionate release.  Section 3582(c) now reads, in relevant part:

> (c) Modification of an imposed term of imprisonment.  The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case –
>
>> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after

> considering the factors set forth in section 3553(a) to the extent that they
> are applicable, if it finds that –
>
> > (i)  extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements
> issued by the Sentencing Commission . . . .

Until recently, I (and many other district courts around the country) interpreted the "applicable

policy statement[] issued by the Sentencing Commission" to be U.S.S.G. § 1B1.13.  *See, e.g.*,

*United States v. Almontes*, 2020 WL 1812713, at *2 (D. Conn. Apr. 9, 2020).  Section 1B1.13

reads, in relevant part:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. §
> 3582(c)(1)(A), the court may reduce a term of imprisonment . . . if, after considering
> the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable, the
> court determines that—
>
> (1)
> > (A) Extraordinary and compelling reasons warrant the reduction; or
> >
> > (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30
> >     years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c)
> >     for the offense or offenses for which the defendant is imprisoned;
>
> (2) The defendant is not a danger to the safety of any other person or to the
>     community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) The reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

Two application notes to section 1B1.13 further elucidate the meaning of "extraordinary

and compelling reasons."  Application note three provides, simply, that rehabilitation of a

defendant "is not, by itself, an extraordinary and compelling reason for purposes of this policy

statement."  U.S.S.G. § 1B1.13 cmt. n.3 (citing 28 U.S.C. § 994(t)).  Application note one sets

forth three specific examples of "extraordinary and compelling reasons" and also one catch-all

provision.  The first example explains that an inmate's medical condition rises to the level of an

4

extraordinary and compelling reason when the defendant is either terminally ill or is suffering from a condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A). The other two specific examples in application note one regard defendants over the age of 65 (U.S.S.G. § 1B1.13 cmt. n.1(B)) and situations in which an inmate may be needed to care for his children or his spouse/partner (U.S.S.G. § 1B1.13 cmt. n.1(C)). *See id.* The catch-all provision, titled "Other Reasons," provides that extraordinary and compelling reasons also exist when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

The Sentencing Commission has not amended section 1B1.13 since Congress passed the FSA. Indeed, it could not because a quorum of the Sentencing Commission still does not exist. As a result, some anachronisms within section 1B1.13 seem in tension with the FSA. In particular, courts note that two clauses in section 1B1.13—including the catch-all provision at U.S.S.G. § 1B1.13 cmt. n.1(D)—still require that the Director of the BOP be the one to bring a motion for relief under section 3582(c)(1)(A). Of course, though, the FSA altered section 3582(c)(1)(A) directly and eliminated that requirement by allowing a defendant him- or herself to bring such a motion under certain circumstances. In part for that reason, the Second Circuit has recently held that section 1B1.13 is *not applicable* to compassionate release motions brought by defendants themselves. *See United States v. Brooker*, 2020 WL 5739712, at *6 (2d Cir. Sept. 25, 2020). Because in this case Colon himself made a motion for compassionate release, I may

"consider the full slate of extraordinary and compelling reasons," and nothing in the "now-outdated version" of section 1B1.13 limits my discretion.  *Id.* at *7.

In granting motions for reductions in sentence under section 3582(c)(1)(A) that are based on the threat posed by COVID-19, courts within this circuit and across the country have concluded that "extraordinary and compelling" reasons for release exist when an incarcerated defendant suffers from health conditions or other infirmities that make him particularly susceptible to serious complications should he contract COVID-19.  *See, e.g.*, *United States v. Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020).

The defendant bears the burden of proving that he or she is entitled to a sentence reduction.  *See United States v. Morales*, 2020 WL 2097630, at *2 (D. Conn. May 1, 2020). Courts "have broad discretion in deciding whether to grant or deny a motion for a sentence reduction."  *United States v. Jones*, 2020 WL 2782395, at *2 (D. Conn. May 29, 2020) (quoting *United States v. Tagliaferri*, 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019)) (cleaned up). Indeed, section 3582(c)(1)(A) grants a district court permissive authority to reduce an inmate's sentence under certain conditions.  *See* 18 U.S.C. § 3582(c)(1)(A) ("[T]he court . . . *may* reduce the term of imprisonment . . . .").  A court may not reduce a term of imprisonment without "considering the factors set forth in section 3553(a) to the extent that they are applicable."  *Id.*; *see also United States v. Torres*, 2020 WL 2815003, at *5 (S.D.N.Y. June 1, 2020) (explaining that courts must consider section 3553(a) factors before granting a sentence reduction pursuant to section 3582(c)(1)(A)).  A court's task in evaluating an inmate's motion for compassionate release based on the threat of COVID-19 "is not to second guess or to reconsider whether the original sentence was just, but to assess whether the defendant's circumstances are so changed that it would be inequitable to continue the confinement of the prisoner."  *United States v. Anton*,

2020 WL 3430187, at *3 (D. Conn. June 23, 2020) (quoting *United States v. Ebbers*, 2020 WL
91399, at *6 (S.D.N.Y. Jan. 8, 2020)) (cleaned up).

## II.   Discussion

### A.   Background

In 1993, federal law enforcement began investigating the Connecticut operations of the
Almighty Latin King Nation (the "Latin Kings").  *See* PSR, Doc. No. 1095, at ¶ 8.  In June 1994,
over 30 Latin Kings members were arrested and, eventually, convicted.  *See id.*  Federal law
enforcement's investigation continued, though, because the Latin Kings' leadership replenished.
*See id.* at ¶ 9–14.  In March 1997, Colon and others were indicted for their roles in the Latin
Kings.  *See* Indictment, Doc. No. 171.  Colon served as president of the New Haven chapter of
the Latin Kings and the regional commander of the southern region of the state, which included
the New Haven and Bridgeport chapters.  *See* PSR, Doc. No. 1095, at ¶ 22; Gov't Opp'n, Doc.
No. 1817, at 3–4.

In 2016 and 2017, Colon and a co-defendant "ran the most prolific heroin operation in the
Latin Kings organization" in Connecticut out of 223 Ferry Street in New Haven.  *See* PSR, Doc.
No. 1095, at ¶ 21.  Colon employed more than 20 Latin Kings as street sellers, and the heroin
sales operated almost 24 hours per day.  *See id.* at ¶ 22, 24.  In the early fall of 1996, Colon went
to jail on a probation violation, but, "despite his incarceration, received his share of the proceeds
of the drug sales, and maintained his ownership and interest in the block while in jail."  *Id.* at ¶
28.

"Accompanying the street sales of heroin were numerous acts of violence, including
murder, in and around 223 Ferry Street during the time frame charged."  *Id.* at ¶ 22.  Two of
Colon's actions as a leader in the Latin Kings are especially relevant to his convictions in this

case.  First, in August 1996, he attempted to murder Betsy Rodriguez.  Rodriguez had a dispute

with another Latin Kings member's girlfriend.  *See id.* at ¶ 15.  As a result, Colon (with others)

participated in a drive-by shooting of Rodriguez and her home in Bridgeport.  *Id.* at ¶ 16.

Luckily, no one was hurt.  *Id.* at ¶ 17.  However, at least five bullets entered Rodriguez's car—

Rodriguez was seated in her car at the time of the shooting—and several bullets entered

Rodriguez's house, where at least one bullet lodged in "the bed where a four year old child was

sleeping."  *Id.*

Second, on December 19, 1996—just six days after Colon had been released from

prison—Colon shot and killed Ronald Foreman, "an innocent bystander."  *Id.* at ¶ 54–55.

Foreman and another individual were on Ferry Street "engaging in bantered conversation with

the sister of a Latin King."  *Id.* at ¶ 54.  Colon, among others, witnessed the conversation and

found it disrespectful.  *See United States v. Colon*, 1998 WL 846744, at *1 (D. Conn. Oct. 27,

1998).  Colon then "grabbed an Uzi from [an associate] and approached the van."  *Id.*  Colon

"came within ten feet of the van on the passenger side," said that he was tired of people "messing

with my block," and then "fired several shots from the automatic weapon."  *Id.*  One of those

shots "struck Foreman in the head and killed him."  PSR, Doc. No. 1095, at ¶ 55.

Colon was born in Puerto Rico and came to the United States when he was a teenager.

*See id.* at ¶ 101–04.  Colon had a very difficult childhood in Puerto Rico.  Colon's father left the

family when Colon was four years old, but Colon still remembers "seeing his father smashing his

mother's head into a wall."  *Id.* at ¶ 101.  Colon grew up in "an extremely violent area" where

"he witnessed a number of murders."  *Id.* at ¶ 102.  Colon became a member of the Latin Kings

in 1995 when he was incarcerated at the New Haven Correctional Center.  *See id.* at ¶ 106.

Colon reported that he did so because "the Kings offered protection and . . . they were everywhere."  *Id.*

B.  Parties' Arguments[2]

Colon argues that two "extraordinary and compelling reasons" warrant his release.[3]  In particular, Colon reports that he is severely obese (BMI of 44),[4] which makes him particularly susceptible to severe illness should he contract COVID-19.  Further, Colon explains that the "particular circumstances" at his place of incarceration also heighten the risk that COVID-19 poses to him.  *See* Mot. for Release, Doc. No. 1805, at 2–7; Colon's Reply, Doc. No. 1819, at 2–3.  Colon then focuses on the Section 3553(a) factors and declares that he is "a far cry from the late adolescent who was convicted of the offense in this case."  Mot. for Release, Doc. No. 1805, at 7; *see also* Colon's Reply, Doc. No. 1819, at 4 (asking me to consider "whether Jesus Colon—the man he is today, not the barely adult person he was over 20 years ago—ought to be punished further").  Colon focuses especially on recent actions that, in his view, signal that he has turned

---

[2]  The parties agree that Colon has exhausted his administrative remedies.  *See* Mot. for Release, Doc. No. 1805, at 1; Gov't Opp'n, Doc. No. 1817, at 2 n.3.

[3]  Colon assures me that I may reduce his sentence even though he received a mandatory minimum sentence (life imprisonment) that has not since been altered.  *See* Mot. for Release, Doc. No. 1805, at 14 (citing *United States v. Bess*, 455 F. Supp. 3d 53, 67 & n.11 (W.D.N.Y. 2020); *United States v. Ben-Yhwh*, 453 F. Supp. 3d 1324, 1333 (D. Haw. 2020); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 407 (E.D. Pa. 2020); *United States v. Schmitt*, 2020 WL 96904, at *6 (N.D. Iowa Jan. 8, 2020)).  I need not address that issue because, even assuming that I could reduce Colon's sentence below his mandatory minimum sentence, I would decline to exercise my discretion to do so, as explained below.

[4]  A recently-submitted medical record confirms that Colon has a BMI of 44.  *See* Colon's Reply, Doc. No. 1819, at 1; Medical Record, Ex. 12 to Colon's Reply, Doc. No. 1819, at 10 (reporting Colon's height at just under 5 feet 9 inches and weight at 297.8 pounds); *Adult BMI Calc.*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (height of 5 feet 9 inches and weight of 297.8 pounds yields BMI of 44) (last visited Oct. 12, 2020).

Before Colon submitted that medical record, the parties disagreed about whether Colon's BMI was under or over 40.  The government calculated Colon's BMI as 38.8, using Colon's then-most recent medical record, which was from April 2018.  *See* Gov't Opp'n, Doc. No. 1817, at 12; Medical Record, Ex. 1 to Mot. for Release, Doc. No. 1805, at 1–3 (reporting Colon's height as 5 feet 8 inches and his weight as 255 pounds).  Colon, on the other hand, self-reported his weight as 275 pounds.  *See* Mot. for Release, Doc. No. 1805, at 1.  If that were true, Colon's BMI would be 41.8.  Based on Colon's most recent medical record, I take as true for purposes of this Order that Colon's BMI is 44.  In any event, Colon's exact BMI is not dispositive because the government already concedes that Colon's obesity (even assuming it to be under 40) amounts to an "extraordinary and compelling reason" warranting Colon's release.

the page at significant potential cost to himself.  *See* Mot. for Release, Doc. No. 1805, at 8;

Colon's Reply, Doc. No. 1819, at 5–7.  (The specifics of that argument are redacted from public

view.)  Colon reports that he has taken advantage of educational and employment opportunities

in prison.  *See* Mot. for Release, Doc. No. 1805, at 8–9.  Colon also includes recent letters from

his cousin,[5] fiancée, sister, daughter, step-father,[6] niece, and two family friends.  *See id.* at 12–

13; *see also* Letters, Exs. 6–9 to Mot. for Release, Doc. No. 1805, at 24–37.  Colon himself

wrote to me to detail his fear of the virus, his perception of the severity of the outbreak at the

institution where he is housed, to apologize for the pain he has caused, and to assure me that he

is a changed man.  *See* Mot. for Release, Doc. No. 1805, at 13; Letter, Ex. 10 to Mot. for

Release, Doc. No. 1805-1, at 38–41.  Colon also informed me that he recently had to miss his

mother's funeral after she died of brain cancer while he was in prison.  *See* Mot. for Release,

Doc. No. 1805, at 13.

Colon also focuses on his life before prison.  Colon points out that his criminal history

before his arrest in this case was minimal.  *See id.* at 9.  Colon also recounts that, at a time, he

was severely addicted to crack cocaine.  *See id.*; *see also* PSR, Doc. No. 1095, at ¶ 112.  Further,

Colon details his troubled upbringing.  *See* Mot. for Release, Doc. No. 1805, at 9–10.  Because a

life sentence was mandatory in this case, Colon points out that no judge has yet considered all

that mitigating information.  *See id.* at 10.  Colon then explains the increasingly large body of

research that links "persistent childhood trauma and criminality in late adolescence."  *See id.* at

---

[5]  Colon's cousin has offered to take Colon into the family home if released.  *See* Mot. for Release, Doc. No. 1805, at 12.  The Government notes that Colon's representation is not a release plan because "it is not clear how many persons live in that household, what their COVID-19 status is, or what living arrangements they would make." Gov't Opp'n, Doc. No. 1817, at 15 (quoting *United States v. Rosario*, 2020 WL 3100461, at *2 (S.D.N.Y. June 11, 2020)).  In Colon's reply brief, he clarifies that his cousin "lives alone in a multi-family house" that has a bedroom on its own floor for Colon.  Colon's Reply, Doc. No. 1819, at 7.

[6]  In his reply brief, Colon reports that his step-father, too, would be willing to house Colon upon release. *See* Colon's Reply, Doc. No. 1819, at 7.  Colon's step-father lives in a home with "several other relatives," but in that home "there is space for Mr. Colon to reside in his own room."  *Id.*

10–12 (citing studies and *Cruz v. United States*, 2018 WL 1541898, at *23 (D. Conn. Mar. 29, 2018), *vacated and remanded*, 2020 WL 5494486, at *2 (2d Cir. Sept. 11, 2020)).

The government takes a different view.  Indeed, the government asserts that Colon is "uniquely ill-suited" for relief because of "the gravity of Colon's crimes and Colon's disciplinary history and other conduct while imprisoned."  Gov't Opp'n, Doc. No. 1817, at 2.  The government believes that I need not address Colon's arguments regarding his obesity and the status of the COVID-19 pandemic at Colon's prison.  *See id.* at 7.  That is because, in the government's view, reducing Colon's sentence would be inconsistent with the purposes of sentencing.  *See id.*  The government notes that numerous courts have denied inmates' motions for compassionate release based on the section 3553(a) factors, regardless of what other extraordinary or compelling reasons might exist.  *See id.* at 7–9 (collecting cases).  In the government's view, the section 3553(a) factors "weigh compellingly against relief" because Colon murdered Foreman and attempted to murder Rodriguez out of a "violent sense of retribution, dominance, and control," and Colon was a leader "in a dangerous criminal enterprise that continued to operate even after federal law enforcement efforts to dismantle it."  *Id.* at 9.

The government disagrees with Colon regarding Colon's criminal history before his arrest in this case.  The government points out that, at the time of his arrest, Colon had "already obtained several convictions" and "had four additional pending state cases."[7]  *Id.* at 10.  The government points out that Colon's conduct in prison should give me further cause for concern.  Indeed, the government recounts a relatively recent incident in which prison authorities

---

[7] Colon had been convicted of:  (1) larceny in the sixth degree (1994); (2) larceny in the fifth degree (1994); and (3) robbery in the second degree (1994).  *See* PSR, Doc. No. 1095, at ¶¶ 91–93.  Colon had charges pending for:  (1) criminal trespassing (1996); (2) possession of a sawed-off shotgun (1996); (3) reckless endangerment in the first degree (1996); (4) threatening (1996); (5) burglary in the first degree (1996); (6) assault in the second degree (1996); and (7) burglary in the third degree (1996).  *See id.* at ¶¶ 95–98.

concluded that Colon was a threat to the safety and security of other inmates.  *See id.* at 10–11.[8]

The government also focuses on the 16 disciplinary incidents that Colon accumulated before

2011.  *See id.* at 11.

 The government also addresses Colon's obesity.  The government concedes that,

according to the CDC, Colon's severe obesity presents an "extraordinary and compelling reason"

warranting his release.  *See id.* at 12.  At the same time, the government again notes that the mere

fact of Colon's obesity "alone does not entitle him to relief."  *Id.* at 12–13 (citing cases in which

district courts have denied compassionate release to inmates with BMIs indicating that they are

obese).  Finally, the government argues that the status of the COVID-19 pandemic at the

institution where Colon presently lives is under control and has improved considerably, to the

point where the prison reports virtually no active infections.  *See id.* at 14–15.[9]

 C.  
 I Will Not Reduce Colon's Sentence.

 Although I recognize the danger that the COVID-19 pandemic poses in jails and prisons

and that Colon's obesity places him at an especially high risk of serious illness should he

contract COVID-19, I will not reduce Colon's sentence because doing so would be inconsistent

with the purposes of sentencing.  Pursuant to section 3553(a), I must impose a sentence

sufficient, but not greater than necessary, to (1) reflect the seriousness of the offense, promote

respect for the law, and provide just punishment, (2) afford adequate deterrence, (3) protect the

public from further crimes of the defendant, and (4) provide the defendant with training, medical

care, and other treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  I also must

[8]  The government provides more explicit detail under seal.  *See* Sealed Gov't Opp'n, Doc. No. 1816, at 10–11; Prison Record, Ex. 1 to Sealed Gov't Opp'n, Doc. No. 1816-1, at 1–10.  Colon, also under seal, disputes the government's interpretation of the relevant incident.  *See* Sealed Colon's Reply, Doc. No. 1821, at 6.
[9]  Again, the government provides more particular detail in a filing under seal.  *See* Sealed Gov't Opp'n, Doc. No. 1816, at 14–15.  Colon also provides an update under seal.  *See* Sealed Colon's Reply, Doc. No. 1821, at 2–3.

consider other factors, including the nature and circumstances of the offense and the history and characteristics of the defendant. *See id.* § 3553(a)(1).

The seriousness of Colon's offenses has not changed since Judge Nevas sentenced Colon 22 years ago. What has changed are the circumstances of Colon's confinement. I do not intend to minimize Colon's elevated risk of severe illness should he contract COVID-19 or the severity of the COVID-19 pandemic. I acknowledge that those who are obese are at an increased risk for severe illness from COVID-19. *People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL AND PREVENTION (last updated Oct. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Indeed, certain courts have released inmates based, in part, on that condition. *See, e.g.*, *United States v. Franco*, 2020 WL 4344834, at *2–3 (S.D.N.Y. June 24, 2020) (releasing defendant who suffered from diabetes and obesity). I also acknowledge that, as a general matter, prisons and jails are among the most dangerous places to be during an epidemic. *See* Mot. for Release, Doc. No. 1805, at 3–4; *see also Covid-19's Impact on People in Prison*, EQUAL JUSTICE INITIATIVE (Aug. 21, 2020), https://eji.org/news/covid-19s-impact-on-people-in-prison/.

However, I am also aware of numerous courts that have declined to grant an inmate's motion for compassionate release when the inmate suffered from obesity, especially when there was no indication that that obesity was not being handled adequately at the inmate's institution. *See, e.g.*, *United States v. Sanchez*, 2020 WL 3790546, at *3 (S.D.N.Y. July 7, 2020) (noting that although inmate's high BMI (38.2) was a risk factor, the BOP was managing inmate's condition well, which "weighs against a finding of extraordinary and compelling circumstances") (quoting *United States v. Foozailov*, 2020 WL 3268688, at *2 (S.D.N.Y. June 17, 2020) (cleaned up); *United States v. Steele*, 2020 WL 4717912, at *3 (W.D. Va. Aug. 13, 2020) (denying

compassionate release to inmate with BMI of 43.5 because inmate had not shown "a particularized risk of contracting the disease at his facility" and the section 3553(a) factors weighed against his release); *United States v. Lindo*, 2020 WL 5038766, at *1 (S.D.N.Y. Aug. 26, 2020) (noting both that Lindo did not suggest "that he is receiving inadequate treatment for" his medical conditions and that "if preexisting medical conditions such as obesity were the end of the compassionate-release inquiry, every inmate who suffers from a COVID-19 risk factor would be entitled to release, no matter the severity of his crime or the potential danger of his release to the community"); *United States v. Vadakin*, 2020 WL 4818440, at *3–4 (D. Conn. Aug. 17, 2020) (denying compassionate release to an inmate suffering from obesity because "[t]he inquiry does not end there" and the "Court harbors significant concerns about the potential danger Defendant poses to the community, given his lack of treatment . . . and short period of incarceration"); *see also* Gov't Opp'n, Doc. No. 1817, at 12–13 (collecting cases).

To the extent that Colon argues that his particular conditions of confinement contribute to "extraordinary and compelling reasons" warranting his release, I cannot agree. As I have mentioned, I understand that, as a general matter, jails and prisons are especially susceptible to outbreaks of disease. However, in determining whether "extraordinary and compelling reasons" warrant a prisoner's early release, courts routinely consider the status of coronavirus infections at the particular institution where the defendant is housed. *See, e.g.*, *United States v. Morales*, 2020 WL 4926609, at *3–4 (D. Conn. Aug. 20, 2020) (citing, *inter alia*, *United States v. Gagne*, 451 F. Supp. 3d 230, 236 (D. Conn. Apr. 2, 2020); *United States v. Gamble*, 2020 WL 1955338, at *5 (D. Conn. Apr. 23, 2020)). I have reviewed the relevant data and arguments that the parties submitted under seal regarding the status of coronavirus infections at the institution where Colon is currently housed. I have also reviewed that status according to the most current available data

14

on the internet.  I agree with the government that the situation has markedly improved, to the point that there are now very few active cases at that facility.  Further, that facility has a detailed COVID-19 management plan that has apparently been implemented successfully.  Thus, it is not clear to me whether Colon's obesity, combined with the status of the coronavirus infections at the institution where he is currently housed, amount to "extraordinary and compelling reasons" warranting Colon's release.  *See* 18 U.S.C. § 3582(c)(1)(A).

In any event, I need not resolve that issue because I hold that reducing Colon's sentence to time served would result in a sentence that would be insufficient to achieve the purposes of sentencing.  In another (highly similar) case, I recently denied an inmate's motion for compassionate release even though the inmate suffered from obesity and Type 2 diabetes.  *See Morales*, 2020 WL 4926609, at *1.  Like Colon, Richard Morales was a high-ranking member of the Latin Kings, had committed murder as a part of his gang activities, and had been sentenced to several concurrent life sentences.  *See id.* at *1–3.  Also like Colon, Morales sought release based, in part, on his obesity.  I denied Morales's motion for compassionate release based on my consideration of the section 3553(a) factors.  *See id.* at *3.  I noted that "Morales committed the most serious kind of crime—murder."  *Id.*  I also wrote that Morales, who committed three murders, had carried out each one "in a particularly brutal manner, and Morales, a then-senior member of the Latin Kings, was far more than a mere accessory to their execution."  *Id.*

My observations regarding Morales are also applicable to Colon.  Like Morales, Colon was a high-ranking member of the Latin Kings.  Also like Morales, Colon committed the most serious kind of crime—murder.  (Although Colon committed only one murder, he was merely lucky that he did not commit a second when he attempted to murder Betsy Rodriguez.)  And like Morales, Colon murdered Ronald Foreman in an especially brutal manner.  Put simply, releasing

15

Colon now would not, in my view, sufficiently reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  *See* 18 U.S.C. § 3553(a)(2)(A).

Similarly, although some aspects of Colon's personal history weigh in his favor—particularly his age at the time of the offense and his troubled upbringing, as described above—those factors simply do not outweigh the seriousness of the offense conduct in this case.  Colon's conduct in prison has apparently been a mixed bag.  On the one hand, I commend Colon for taking advantage of educational and vocational opportunities.  On the other hand, I agree with the government that it is significant that, relatively recently, prison officials concluded that Colon posed a severe threat to other inmates.  *See* Gov't Opp'n, Doc. No. 1817, at 10–11 (redacted to protect location information).  In sum, it seems that Colon has made some progress, but it is not enough to outweigh the seriousness of this offense, the need to deter Colon from committing further crimes, and the need to protect the public.

### III.   Conclusion

For the foregoing reasons, Colon's motion for release, doc. no. 1805, is **denied**.  Colon's motions to seal, doc. nos. 1806 and 1820, are **granted**.  The government's motion to seal, doc. no. 1815, is **granted**.  And Colon's sealed motion for release, doc. no. 1807, is **denied as moot** because it requests the same relief as Colon's motion for release, doc. no. 1805, which this Order denies.


IT IS SO ORDERED.


Dated at Bridgeport, Connecticut, this 12th day of October 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge